**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON  DIVISION**

| | | |
|---|---|---|
| DAVID K. BROYLES, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-02320 |
| | § | |
| STATE OF TEXAS, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The plaintiffs challenge a municipal incorporation election held on May 10, 2008, in which

Weston Lakes, a private gated community in Fort Bend County, Texas and adjacent land were

converted into a Type B General-Law Municipality called the City of Weston Lakes.[1] The plaintiffs

seek a declaratory judgment that Texas Local Government Code § 7.006, which permits "[e]ach

qualified voter who resides within the boundaries of the proposed municipality" to vote in a Type

B municipal incorporation election, is unconstitutional because it does not permit nonresident

owners of property in the area of the proposed incorporation to vote.  The plaintiffs sue under 42

U.S.C. § 1983, seeking an injunction voiding the results of the election on the grounds that § 7.006

is unconstitutional and that there were federal and state law violations in the conduct of the election.

---

[1] "A community may incorporate . . . as a Type B general-law municipality if it: (1) constitutes an unincorporated town or village; (2) contains 201 to 9,999 inhabitants; and (3) meets [certain square mileage] requirements prescribed by Section 5.901." TEX. LOCAL GVT. CODE § 7.001.  A Type-B municipality annually elects its own municipal government, which is to consist of a mayor, five aldermen, and a marshal. *Id.* § 23.021.  The governing body of a Type B municipality may adopt ordinances or bylaws "not inconsistent with state law, that the governing body considers proper for the government of the municipal corporation. *Id.* § 51.032.  The municipality may hold and dispose of personal property and real property located within the municipal boundaries. *Id.* § 51.034.  Municipalities have the power to levy taxes against their residents.  § 102.009.

The plaintiffs also seek money damages.  The plaintiffs sue the State of Texas, Fort Bend County, the Weston Lakes Property Owners' Association ("WLPOA"), the Weston Lakes Community Incorporation Project Committee (the "Incorporation Committee"), the Citizens' Committee for the Incorporation of Weston Lakes ("Citizens' PAC"), the individual trustees of the WLPOA, and the chairman of the Incorporation Committee and the Citizens' PAC.  (Docket Entry No. 27 ¶ 6).  The plaintiffs also assert a state-law shareholder derivative action against the trustees of the WLPOA.

The following motions are pending:

- The plaintiffs have moved for a declaratory judgment that section 7.006 of the Texas Election Code is unconstitutional because it permits only residents of the area of proposed incorporation, to the exclusion of nonresident property owners in the area of proposed incorporation, to vote in municipal incorporation elections.  (Docket Entry No. 5).

- The plaintiffs have moved for an injunction against the November 4, 2008 mayoral and aldermen elections for the City of Weston Lakes.  The plaintiffs argue that they have shown a strong likelihood of prevailing on their claim that section 7.006 of the Texas Election code is unconstitutional and that the conduct of the May 10, 2008 incorporation election violated their constitutional rights and federal and state election law, and that they would suffer irreparable harm if the elections occurred.  The motions also ask this court to declare the May 10, 2008 municipal incorporation election "null and void" and order a new election. (Docket Entry Nos. 3, 6).  Fort Bend County and the Incorporation Committee have responded, arguing that as a matter of law the plaintiffs cannot succeed on the merits and cannot show irreparable harm and asking that the relief sought be denied and the claims

dismissed.  (Docket Entry Nos. 4, 12, 14).  The plaintiffs have replied.  (Docket Entry Nos. 17, 18).

•       The State of Texas has moved to dismiss the plaintiffs' complaint that Texas and Fort Bend County violated the National Voting Registration Act ("NVRA").  (Docket Entry No. 21). The plaintiffs have responded, (Docket Entry No. 24), and the defendants have replied, (Docket Entry No. 25).

•       The Incorporation Committee has moved to dismiss the claims against it and its chairman, Clifton Aldrich.  (Docket Entry No. 22).  The plaintiffs have responded.  (Docket Entry No. 23).

•       The plaintiffs have moved to amend their complaint and have filed a proposed First Amended Complaint.  (Docket Entry No. 27).  Fort Bend County and the Citizens' Committee for the Incorporation of Weston Lakes oppose the motion.  (Docket Entry No. 27).  The plaintiffs have moved to strike the opposition.  (Docket Entry Nos. 30, 31).

Based on a careful review of the pleadings; the motions, responses, and replies; the parties' submissions; and the applicable law, this court grants the plaintiffs' motion to amend insofar as it adds or clarifies allegations relating to the May 10, 2008 election.  The motion to amend is denied insofar as it seeks to add allegations relating to the conduct of the November 4, 2008 election. (Docket Entry No. 27 ¶ 64 n.84, 85).  This court dismisses the plaintiffs' federal constitutional and statutory claims on the ground that the allegations relating to the May 10, 2008 election do not, as a matter of law, provide a basis for the relief the plaintiffs seek.  This court also grants the motions to dismiss filed by the State of Texas and the Incorporation Committee and its chair, Clifton H. Aldrich.  The requests for declaratory and injunctive relief that are predicated on the claims of

federal constitutional and statutory violations are denied.  Because the federal claims are dismissed with prejudice, this court does not address the remaining state-law claims, which are dismissed without prejudice to their assertion in state court.

No later than **April 15, 2009**, the parties are to identify any remaining issues that this court must address or file a proposed order of dismissal.

The reasons for these rulings are explained in detail below.

## I.      Background

### A.      The Parties

The plaintiffs include both resident and nonresident property owners in the City of Weston Lakes.  They have organized themselves into three groups.  The first group, called the "Resident Plaintiffs," live in the gated community of Weston Lakes.  This group includes David K. Broyles, Shellie Galik Broyles, Frederick B. Howden IV, Eric Jones, Stacey Jones, Brian E. Koons, James R. McKean, Jerry Mosbacher, James E. Ritter, Jeannell M. Ritter, Cheryl Stalinsky, and Lisa H. Theut.  The second group, called the "Bowser Road Plaintiffs," are residents of property on the east side of Bowser Road, a strip of land to the northwest of the community of Weston Lakes that was incorporated into the City of Weston Lakes in the challenged election.  This group includes Michael S. Cooper, Laura G. Gonzales, Willie Irvin, William Patrick McArthur, and Jessie Fay Oliver.  The third group, called the "Plaintiffs Residing Outside Weston Lakes," consists of individuals who own real property in the City of Weston Lakes but reside elsewhere.  This group includes Bernice F. Gilmore, Charles D. McWilliams, Brian C. Kimmel, Martin G. Parr, and James A. Winne, III.

The plaintiffs have sued a number of defendants.  The State of Texas is sued in the name of the Attorney General, Greg Abbott, and the Secretary of State, Hope Andrade.  Fort Bend County

is sued in the name of its County Judge, Robert E. Hebert, and the County Clerk, Dianne Wilson. The Weston Lakes Property Owners Association, Inc. ("WLPOA") is sued in the name of its president, Herbert S. Yates.   The trustees of the WLPOA, Herbert S. Yates, Patrick A. Harris, Charles V. Flowers, and Rhonda Zacharias, are also named as individual defendants.   The Citizens' Committee for the Incorporation of Weston Lakes ("Citizens' PAC") and the Weston Lakes Community Incorporation Project Committee ("Incorporation Committee") are sued in the name of their chairman, Clifton H. Aldrich.   Aldrich is also named as an individual defendant.

### B.      The Community of Weston Lakes and Bowser Road

The community of Weston Lakes is a 1,400-acre continuous tract located in Fort Bend County on the south side of FM 1093 between the City of Simonton and the City of Fulshear. Weston Lakes is a private gated community with a guardhouse, security gates, swimming pool, country club, and golf course.   The common areas, easements, and roads in Weston Lakes are governed by the WLPOA, a nonprofit corporation.   The WLPOA operates under articles of incorporation, bylaws, and a lengthy document entitled Covenants, Conditions and Restrictions ("CCRs").   (Docket Entry No. 27 ¶¶ 11–14).

The community of Weston Lakes has about 800 residences and 427 vacant lots, which include 311 vacant lots in the original Weston Lakes community and 116 vacant lots in Riverwood Forest, a development within the gated community that was determined after a lawsuit in the 1990s to be part of Weston Lakes.   The plaintiffs assert that commercial builders and contractors own over 150 of the vacant lots and private individuals own the rest.   Residents in the Riverwood Forest portion of Weston Lakes receive water, sewer, and drainage services from a private company, Aqua Texas.   The rest of the Weston Lakes lots receive utility services from Municipal Utility District No.

81 ("MUD # 81"), which levies an annual tax of 39 cents per $100 of the appraised value of the residence, including land.  Owners of vacant lots in Weston Lakes must pay an annual $60 "stand-by" fee.  All Weston Lakes landowners, whether their lot is occupied or vacant, must pay $595 in annual maintenance fees to the WLPOA and must pay $879.72 in annual dues to the Weston Lakes Country Club.  (*Id.* ¶¶ 14–19).

Bowser Road lies to the north and west of the community of Weston Lakes.  The residents of Bowser Road live outside Weston Lake's gates, do not receive services from MUD # 81 or Aqua Texas, do not pay maintenance fees to the WLPOA, and do not pay membership fees to the Weston Lakes Country Club.  (Docket Entry No. 6 ¶ 8).  The plaintiffs describe the Bowser Road land as "rural woodlands and farmland, including various kinds of structures, buildings, sheds, a burnt home, an abandoned car, mobile homes, cattle, and horses." (Docket Entry No. 27 ¶ 4).  The eastern side of Bowser Road was incorporated into the City of Weston Lakes in the challenged election. (*Id.*).

### B.    The Municipal Incorporation Proposal and Application

The plaintiffs allege that according to the WLPOA meeting minutes, which are not part of the record, the WLPOA trustees first discussed the possibility of incorporating the Weston Lakes subdivision as a Class-B municipal corporation on April 24, 2006 and raised the issue again on January 24, 2007.  The proposed incorporation was for "tax reasons."  The plaintiffs allege that in January and February of 2007,[2] WLPOA created the Incorporation Committee to "recommend to the Board of Trustees a course of action with respect to the Board proposing an incorporation project

---

[2]  The complaint identifies the date as "January and February 2008," but the year appears to be in error, given that the Incorporation Committee is alleged to have issued a report on September 26, 2007. (Docket Entry No. 27 ¶¶ 20, 22).

6

to the community."  Aldrich was appointed chairman and was involved in choosing the committee members.  (*Id.* ¶ 20).  The plaintiffs allege that Aldrich formed the Citizens' PAC at that time to advocate for incorporation.  (*Id.* ¶ 9(C)).

The Incorporation Committee held its first organizational meeting in April 2007[3] and allegedly had subsequent "private nonpublic meetings in May, June, July and August."  According to the plaintiffs, Aldrich kept the committee's affairs "secret."  (*Id.* ¶ 21).  On September 26, 2007, the Incorporation Committee issued a report recommending incorporation not only of Weston Lakes, but also of "the area outside the gated Weston Lakes community south and east of Bowser Road." The report stated that this would "allow the city to control development when it occurs on the western boundary."  (*Id.* ¶ 22).  The proposed City of Weston Lakes was to be 1,676.44 acres. (Docket Entry No. 14, Ex. 1-B).

The plaintiffs allege that in December 2007, Aldrich "covertly and stealthily" had attorneys prepare an "Application to Incorporate the Community of Weston Lakes, Texas as a Type B General-Laws Municipality."  Aldrich and his wife, the trustees, and the Citizens' PAC members signed the application and then allegedly engaged in a "furtive[ ] and clandestine[ ] campaign" to get other residents to sign.  (*Id.* ¶ 24).  The plaintiffs allege that Aldrich directed the trustees "not [to] show or give a copy of the Application to the signers," and not to tell them that as signatories to the Application, they were affirming a "desire that said community be incorporated as a Type B general-law municipality."  According to the plaintiffs, the trustees told signers only that "the Application was to ask the county judge to set an election on incorporation," (*id.* ¶ 9(E)), and did

---

[3]  The complaint states that the initial organizational meeting occurred in April 2008, but this would postdate the Incorporation Committee's September 26, 2007 report.   An April 2008 initial meeting date would also mean that the "nonpublic meetings in May, June, July, and August," after the initial meeting would have occurred *after* the May 10, 2008 special election.  (Docket Entry No. 27 ¶ 21).

not tell them "that if the majority voted FOR, then Weston Lakes would become a 'city,'" (*id.* ¶ 25). The plaintiffs assert that signatories were told not to disclose the existence of the application until it was approved by the County Judge, because Aldrich wanted to obtain the necessary signatures "before an opposition to incorporation could be mustered."  (*Id.* ¶ 24).

The plaintiffs have submitted an affidavit signed by Eric Smith, a Weston Lakes resident since December 2000.  Smith stated that a neighbor told him that a WLPOA trustee, Flowers, had a "petition to get the issue of incorporation of Weston Lakes . . . on the ballot."  Smith and his wife went to Flowers's home.  Smith stated that Flowers explained that "the main reason for incorporation was because Fulshear was intending to annex Weston Lakes and the taxes would be higher if Fulshear was to annex Weston Lake" – 25 cents per $100 of appraised value versus only two or three cents if Weston Lakes were to incorporate.  (Docket Entry No. 1, Ex. C).  Smith stated that he "did not know the voting would result in Weston Lakes becoming a city," but "thought it was just the opportunity for consideration to become a city."  (*Id.*).  The plaintiffs also submitted an affidavit signed by Jerome Vaeth, who stated that he was asked to "sign the petition to have a vote on the Weston Lakes incorporation issue."  Vaeth stated that he and his wife signed the petition but were not told or shown language stating that the signers wanted the community to be incorporated. Vaeth states that he would not have signed the application if he had seen the language.  (Docket Entry No. 7, Ex. P).

By January 7, 2008, the Incorporation Committee had gathered 132 signatures for the application, well over the 50 signatures required under Texas Local Government Code § 7.002 to initiate an election on a proposed incorporation measure.  The application was presented to the Fort Bend County Judge, Robert E. Hebert.  (Docket Entry No. 14, Ex. 1-B).  County Judge Hebert

8

granted the application, as he was required to do under Texas Local Government Code § 7.003, and

issued an Order of Special Election on February 26, 2008.  (Docket Entry No. 27 ¶ 29 n.60).  The

Order stated that a special election would be held on May 10, 2008 "to confirm or deny the creation

of the Community of Weston Lakes as a Type B General-Law Municipality as required by Title 2,

Chapter 7 of the Government Code."   (*Id.* ¶ 29).   The Order appointed Robert French as the

presiding election officer.  French was to "appoint two election judges and two clerks to assist in

conducting the election."  (Docket Entry No. 14, Ex. 1-C).

The plaintiffs complain that French was an improper choice because he was a "political

friend[ ] and supporter[ ]" of elected County officials who resided in Weston Lakes, was a member

of a senior citizens' pro-incorporation group, and was a friend of the WLPOA trustees and members

of the Incorporation Committee and Citizens' PAC.  The plaintiffs object to one of French's

appointments to the position of election judge, Alfred Vahlkamp, on similar grounds. (Docket Entry

No. 27 ¶ 59).

### C.    Notice and Advocacy Efforts for the Proposed Incorporation

On February 28, 2008, the Incorporation Committee hosted its first public meeting.  The

meeting was held at the Weston Lakes Country Club.  Aldrich gave a presentation explaining that

incorporation was desirable because it was expected that the City of Fulshear would attempt to

annex the community of Weston Lakes within a few years, which would result in higher taxes and

prevent Weston Lakes from incorporating in the future.  Aldrich explained that the Bowser Road

property bordering Weston Lakes had been included in the incorporation proposal because Weston

Lakes "wanted to control future development" to avoid having a "Wal-Mart" or "cement plant"

close by.  According to the plaintiffs, Aldrich stated at the meeting that Bowser Road residents had

not been told that their land would become part of Weston Lakes if the election succeeded because "we don't have to notify them." (*Id.* ¶ 27). The plaintiffs assert that Aldrich and the trustees did not disclose at this meeting that an application for an election on incorporation had already been submitted and approved and an election scheduled, or that the members of the Incorporation Committee had formed the Citizens' PAC "for the purpose of campaigning for a YES vote to incorporate Weston Lakes." (*Id.*).

According to the plaintiffs, although the WLPOA trustees stated at this and subsequent meetings that the WLPOA was "neutral and did not take a position FOR or AGAINST incorporation," (*id.*), the trustees took steps to encourage incorporation, including committing WLPOA funds to a pro-incorporation campaign, making a database of the names and addresses of Weston Lakes residents available to the Citizens' PAC for the emailing and bulk-mailing of campaign materials, and denying the plaintiffs access to this database.[4] Trustee Yates allegedly also mailed a pro-incorporation letter in his personal name to Weston Lakes residents using mailing labels from the WLPOA. (Docket Entry No. 27 ¶ 9(C), (D)). The plaintiffs allege that Aldrich, the trustees, and "their agents, friends and surrogates" "actively persuaded residents to allow the placement of 'Vote Yes' signs on [their] front lawn[s].'" The plaintiffs allege that one landowner

---

[4] The plaintiffs also raise more general complaints about the WLPOA. They complain that WLPOA meetings are scheduled at 6:00 p.m., before many Weston Lakes community members have arrived home from work. They allege that the WLPOA refuses to provide written agendas for its meetings and refuses to provide copies of the minutes from prior meetings. The plaintiffs also complain that the WLPOA trustee meetings, at which "serious issues of security, traffic control, speed-bumps, lakes' maintenance, E-Z tag electronic entry system, street parking, alligators in the lakes, loose dogs, barking dogs, children operating golf carts, Rvs and boats parked in driveways, contractors' spec-homes uncompleted, and etc.," are discussed, are not open to the public. (Docket Entry No. 27 ¶ 83). The plaintiffs also allege that Sierra, a contractor that owns 110 vacant lots in the community of Weston Lakes, supported many of the candidates for trustee in WLPOA board elections in exchange for the candidates' promise not to assess the annual $585 maintenance charge on Sierra's lots. (*Id.* ¶ 76).

"relent[ed] to putting up a sign after discussing the issue with a proponent for "more than an hour," and that when the landowner later changed her mind and took down the sign, "another sign was erected the next day."  (*Id.* ¶ 9(F)).

On March 27, 2008, the WLPOA held a second public meeting about incorporation at the Weston Lakes Country Club.  Again, the WLPOA expressed its neutrality.  An attorney hired by the Incorporation Committee spoke and answered questions.  According to the plaintiffs, the attorney allegedly conceded that annexation to the City of Fulshear was not imminent and that such a step would probably take at least five years.  The attorney also admitted that he "knew of no city that has unilaterally annexed additional territory" since the new annexation statute took effect.  (*Id.* ¶ 28 & n.59).[5]

On April 7, 2008, Fort Bend County posted a "Notice of Election for the Incorporation of the City of Weston Lakes" at the Fulshear/Simonton branch of the Fort Bend County Library.[6]  On April 10, 2008, the County posted the same notice at the Fort Bend County Precinct 3 office building (which was next to the Fulshear/Simonton library) and the Weston Lakes Country Club.  (Docket Entry No. 1, Ex. G).[7]  Pro-incorporation citizens of Weston Lakes also publicized the election.  A

---

[5]  The plaintiffs also include as part of the record, but do not address, Resolution No. 08-145, dated April 15, 2008, by the City Council of Fulshear.  The Resolution states that the City Council "has no plans or intent to annex the subdivision, Weston Lakes."  The Resolution is signed by the City of Fulshear Mayor Jamie W. Roberts, the City Secretary (and plaintiff in the present suit), Diana Gordon Offord, and four of the five City of Fulshear Aldermen.  (Docket Entry No. 7, Ex. Q-T).

[6]  The Fulshear/Simonton branch of the Fort Bend County Library, located at 8100 FM 359 Road South, Fulshear, Texas 77441, is 2.61 miles from the Weston Lakes Country Club.

[7]  Fort Bend County submitted an affidavit stating that for each of the thirty days preceding the election date, the county placed full-page copies of the Order of Special Election in three newspapers of general circulation: the Katy Times, the Fort Bend Herald, and the Fort Bend Sun.  (Docket Entry No. 14, Ex. 3).  The plaintiffs agree that this was done but maintain that there was a failure to follow § 7.003 of the Texas Local Government Code.  (Docket Entry No. 18 at 14).

full-page copy of the County Judge's "Order of Special Election" was placed in the April 2008 issue of the Weston Lakes monthly news bulletin. (Docket Entry No. 27 ¶ 29). Trustee Yates sent notice of the election in a pro-incorporation letter to all residents of Weston Lakes. (*Id.*, ¶ 9(C)). Aldrich, on behalf of the Incorporation Committee, mailed Bowser Road residents within the proposed incorporated boundaries of the City of Weston Lakes a copy of the Order of Special Election. (Docket Entry No. 1, Ex. AA). Aldrich's cover letter stated as follows:

> The Election Order from the County judge regarding the incorporation of Weston Lakes is being sent to you for the purpose of informing you of the Weston Lakes Incorporation Election. The proposed boundaries of the City of Weston Lakes include the land that is to the West of Weston Lakes and to the East of Bowser Road to the Brazos River. All residents of the area to be incorporated who are registered voters are eligible to vote in the election. The impact on both residents and land owners is negligible.

(*Id.*). Bowser Road residents also saw a large billboard sign on FM 1093 near their homes stating "Vote NO on May 10th." (*Id.*, Exs. AA, N).

The plaintiffs allege that the notices Fort Bend County posted were insufficient to satisfy the state statutory requirement that notice of a municipal election be "posted at three public places in the community for the 10 days preceding the date of election." TEX. LOCAL GVT. CODE § 7.003. The plaintiffs complain that the notice posted at the country club was not accessible to Bowser Road residents. (Docket Entry No. 27 ¶ 29). The plaintiffs allege that the notice at the Fulshear/Simonton Library was insufficient because the building was outside the community of Weston Lakes and because the notice itself was posted on a bulletin board "in the alcove of the restrooms." (*Id.* ¶ 58). The plaintiffs allege that the notice posted inside the Precinct 3 building was insufficient because the building was outside the community of Weston Lakes and was often locked to the public. (*Id.*). The plaintiffs allege that the notices at the Fort Bend County Rosenberg Annex and Courthouse

Complex were too far away from the community that would be voting on incorporation.  According to the plaintiffs, notice could have (and should have) been posted on two bulletin boards at the entrance and exit gates of Weston Lakes.  (Docket Entry No. 6 at 18).

The plaintiffs also object to the notice that Aldrich provided to the residents of east Bowser Road.  Although the plaintiffs concede that each Bowser Road resident received a copy of the Order of Special Election from Aldrich, they assert that the notice was not sufficient because it was accompanied by a cover letter stating that the proposed incorporation would have a "negligible" effect on residents and landowners.  (Docket Entry No. 1, Ex. AA).

### D.    The Municipal Incorporation Special Election

Early voting for the incorporation measure was held on April 28 through May 3, 2008 and on May 5 and 6, 2008.  Election day was May 10, 2008.  There were two other initiatives to be voted on in the election: a Fort Bend County bond referendum, and an aldermen election for the City of Fulshear.  (*Id.* ¶ 66).  The official ballot for the incorporation issue was titled "Election for Incorporation of the Community of Weston Lakes."  It sought a "for" or "against" vote on the proposition that "[t]he community of Weston Lakes shall incorporate as a Type B, General-Law Municipality under the Provisions of Chapter 7 of the Texas Local Government Code."  (Docket Entry No. 1, Ex. H; Docket Entry No. 27 ¶ 32).

The plaintiffs allege constitutional, federal statutory, and state statutory violations and irregularities in the conduct of the municipal incorporation election.

### 1.    The Residency Requirement

In accordance with Texas Local Government Code § 7.006, only residents within the boundaries of the proposed area of municipal incorporation were permitted to vote on the

13

incorporation issue.  Nonresident owners of property within the proposed area of municipal incorporation could not vote.  Plaintiff Brian C. Kimmel and his wife own a house in Weston Lakes but resided in Kerville, Texas and leased the Weston Lakes home to another family.  Kimmel complained that his lessees were able to vote on the referendum but he and his wife were not.  Kimmel alleges that this was unfair because he, not the lessees, will pay any additional taxes on the property levied by the City of Weston Lakes.  (*Id.* ¶ 37).  Plaintiff James A. Winne, III owns 141.023 acres outside the community of Weston Lakes, only part of which was within the proposed area of municipal incorporation.  Because Winne's actual residence was outside the boundaries of the proposed incorporation area, he was not permitted to vote in the election.  (*Id.* ¶ 22 n.52).

### 2.    Improper Electioneering

The plaintiffs allege improper electioneering by pro-incorporation citizens.  According to the plaintiffs, during early voting, Aldrich, the WLPOA trustees, and members of the Incorporation Committee and Citizens' PAC "vigorously approach[ed] voters" within 100 feet of the poll at the Precinct 3 building "to urge and persuade [them] to vote "YES" for incorporation."  (*Id.* ¶ 33).  Plaintiff Cheryl M. Stalinsky submitted an affidavit stating that she was "accosted" by Herbert Yates, a WLPOA trustee, as she was walking toward Precinct 3 on April 30, 2008.  Yates asked her how she was going to vote and Stalinsky replied that she told him she was going to vote "no."  Stalinksy reported no difficulty in voting.  Stalinsky asserted that her friend received similar treatment from Vern Flowers and another man on May 3, 2008.  (Docket Entry No. 1, Ex. O).  The plaintiffs have also submitted an affidavit from Diana Gordon Offord, the City Secretary of Fulshear, stating that she saw a member of the "Vote Yes" campaign "r[u]n toward a woman going into [the] Precinct 3 building" with "a piece of paper in hand."  (*Id.*, Ex. O-1).  Another plaintiff, Willie Irvin,

who lives on the eastern side of Bowser Road and owns four horses, was told by"Vote Yes"

advocates at the polls that "they wanted to control the land around them so there would be no

'chicken farm'" outside the community of Weston Lakes.  (*Id.*, Ex. N).  The plaintiffs assert that

election judge Vahlkamp "failed to adequately control, direct, and police" this electioneering.

(Docket Entry No. 27 ¶¶ 9(G), (H)).

### 3.    Failure to Offer Provisional Ballots

The plaintiffs also complain that "[o]n scores of occasions" during early voting, poll officials

"failed to offer provisional ballots to voters whose name did not appear on the County's voter

registry, but who did present adequate identification and proof that they resided in Weston Lakes."

(*Id.* ¶ 9(I)).  Some of the plaintiffs who were not offered a provisional ballot were properly listed on

the precinct voter registry but were not on a subset list of voters eligible to participate in the

municipal incorporation election.  Other plaintiffs not offered a provisional ballot were not listed

on the precinct voter registry, despite the fact that they had registered to vote.  Other plaintiffs not

offered a provisional ballot had not registered but could vote if they presented proof of current

residence in the form of "Texas driver's license[s], MUD # 81 statements, [or] County tax bills."

(*Id.* ¶ 34(A)).  Still other plaintiffs were given a provisional ballot but were given incorrect

information about the ballot.

The plaintiffs offer the following specific examples:

> a.    *Persons Properly in the Voter Registry But Not On the List of*
> *Eligible Voters*

Plaintiff James Ritter alleges that he presented a voter registration card on May 10, 2008

indicating his eligibility to vote in the municipal incorporation election.  He was given a voting

machine access code that permitted him to vote on the Fort Bend County bond issue but not the

incorporation issue.  After voting, Ritter and the election officials determined that his name had erroneously been omitted from the list of voters eligible to vote on the municipal incorporation issue because the name of his street was misspelled on the official election map.  According to Ritter, the election officials told him that he had "already cast [his] ballot and there was nothing they could do." He was not offered a provisional ballot.  (Docket Entry No. 1, Ex. I-3).  Ritter's wife, Jeanell Ritter, had a similar problem later that day.  As she was exiting the polls, however, a man from the "Vote Yes" table learned of her problem and instructed the election official to "give [her] a provisional ballot."  Ritter voted by provisional ballot.  (*Id.*, Ex. K).

Plaintiff Jessie Fay Oliver, a resident of east Bowser Road, was also given an access code during early voting that allowed her to vote on the Fort Bend County bond issue but not the municipal incorporation issue.  When Oliver asked why, the election official replied that "he did not understand why [she] could not vote either."  The plaintiffs allege that "Gracie" from Fort Bend's Election Administration called Oliver several days later and said that she could come to the Election Administration building to vote on the Weston Lakes incorporation issue.  Oliver went and voted by provisional ballot.  (*Id.*, Ex. J).  The plaintiffs contend that Oliver, an African-American woman, was given "preferential treatment because they were fearful of a racial component if [she] pursued her complaint."  (Docket Entry No 27 ¶ 34(A) n.64).[8]  Laura G. Gonzales, an east Bowser Road

---

[8]  Texas and Fort Bend County have submitted an affidavit by Robin Heiman, Interim Director of Elections Administrations for Fort Bend County.  Heiman explained that on May 1, 2008, the Election Office discovered that residents east of Bowser Road but outside the Weston Lakes community had inadvertently been excluded from the county's list of persons eligible to vote on the incorporation issue.  The Office investigated and learned from the voting records that only one person in the affected area, Jessie Fay Oliver, had already voted.  Oliver was invited to vote on the incorporation issue.  Heiman stated that the problem was corrected after May 1, 2008.  (Docket Entry No. 14, Ex. 2).

resident, was permitted to vote on the incorporation proposal on May 5, 2008 without issue.  (Docket Entry No. 1, Ex. A-1).

> **b.**  *Persons Who Properly Registered But Were Not in the Registry*

Plaintiff Eric Jones changed his voter registration online in late 2007 when he updated his driver's license to show his Weston Lakes address.  When he went to vote on April 29, 2008, he had not yet received an updated voter registration card and was not included on the voter registry for his current address.  Jones alleges that he presented his driver's license with his Weston Lakes address but was given an access code that permitted him to vote on the Fort Bend bond issue but not on the municipal incorporation issue.  Jones was not offered a provisional ballot.  He alleges that he was told that he was told that "the only thing [he] could do was to complete a change of address voter registration."  (*Id.*, Ex. I-1).

James L. Fields, who moved to Weston Lakes in March 2006, had not been able to vote in an earlier election, in November 2007, because his name was not on the voter registry of Weston Lakes residents.  Fields filled out an application for change of voter registration in November 2007, but never received a new voter registration card.  On May 10, 2008, Fields was unable to vote on the incorporation issue and was not offered a provisional ballot.  (Docket Entry No. 7, Ex. P-1).

> **c.**  *Persons Not Registered But With Other Forms of Identification*

Plaintiffs David and Shellie Broyles moved to Weston Lakes on January 27, 2008.  At the time of the election, they had not yet updated their driver's licenses or voter registration cards.  They brought their MUD # 81 bill to prove that they were Weston Lakes residents.  At the polls, they were told that they were eligible to vote on the Fort Bend County bond issue but not on the incorporation issue.  They were not offered provisional ballots.  (Docket Entry No. 1, Ex. I).

Plaintiff Lisa Theut did not recall whether she had applied for an updated voter registration card by the time of the municipal incorporation election but states that the address on her driver's license showed that she was eligible to vote on the municipal incorporation issue.  At early voting, Theut was told that she was eligible to vote on the Fort Bend County bond issue but not on the municipal incorporation issue.  According to Theut, the election judge, Vahlkamp, said "[o]h look, another young voter."  The plaintiffs assert that "[the implication [w]as that the young residents voted NO and the senior-citizen-resident[s] voted YES because by Texas law[,] their school tax rate does not rise after age 65." (Docket Entry No. 27 ¶ 34(C)).  Theut filled out a change of registration card at the polls but was not offered a provisional ballot to vote on the municipal incorporation issue. (Docket Entry No. 1, Ex. L).  Theut's husband, Scott Theut, had a similar experience at early voting several days later.  (*Id.*).

### d.    *Persons Given Provisional Ballots But Provided Misinformation*

Plaintiff Stacey Jones, Eric Jones's wife, alleges that she had not received her new voter registration card in time for the election and was told when she went to vote on May 10, 2008, that she was not allowed to vote on the incorporation issue.  Jones "told [the official] my husband told me to ask for a provisional ballot."  Jones was permitted to vote by provisional ballot but was told that her "vote w[ould] only be counted if there [was] a tie."  (*Id.*, Ex. I-2).

Plaintiff Brian Koons alleges that he had applied for an updated voter registration card but had not received it in time for the election.  On May 10, 2008, he was told that he was not on the list of eligible voters and that he not could vote on the municipal incorporation issue.  Koons asked for and received a provisional ballot, although "[t]he election secretary appeared annoyed and said . . . she did not think it would count."  (*Id.*, Ex. M).

### 4.      Delays Caused By Election Staff

The plaintiffs allege that every time election judge Vahlkamp had a voter problem, he would telephone the County Elections Office in Rosenberg for instruction.  The plaintiffs allege that these conversations were "lengthy" and caused long lines and assert that there should have been more election workers.  The plaintiffs assert that some voters probably "departed without voting[ ] because of time limitations and restraints."  (Docket Entry No. 27 ¶ 66).  The plaintiffs offer no specific examples of voters who wanted to vote but could not wait and concede that they "have no evidence[ ] at this time" that this problem was "fatal."  (*Id.*).

### 5.      Misinformation Provided by Fort Bend County

The plaintiffs allege that Fort Bend County contributed to the voting irregularities and confusion.  Plaintiff Koons called County Judge Hebert's office on May 1, 2008 to ask whether the voter registry showed that he was eligible to vote in the municipal incorporation election.  Judge Hebert's secretary told Koons that he was not on the list and that it was too late to update his registration.  Koons complained that he had changed his registration when he changed his driver's license in 2005, but the secretary replied that "they [we]re not connected to the DPS."  The secretary never mentioned the provisional ballot option.  Koons learned about the possibility of provisional voting from a neighbor.  (Docket Entry No. 1, Ex. M).  Plaintiff Willie Irvin, an east Bowser Road resident, complains that "Gracie" at the Fort Bend County Election Office erroneously told him that he could not vote because only residents of the community of Weston Lakes could vote on the municipal incorporation issue.  Irvin did not go to the polls but asked his sister-in-law, an election worker, to check whether he was on the list of voters eligible to vote and was told he was not.  Lofton told him he was not on the list.  (*Id.*, Ex. N).  Plaintiff Michael Cooper, a resident of Bowser

Road, called the Fort Bend County Commissioner on an unspecified date and called County Judge

Hebert's office on Friday, May 9, 2008, to ask whether he was eligible to vote in the election.

Cooper did not receive a return call until Monday, May 12, 2008, after the polls closed.  He was told

that he was eligible to vote.  (*Id.*, Ex. N-1).   After the election, David Broyles called the County

Judge's office and spoke with the Director of Administrative Services for Fort Bend County, J.C.

Whitten.  Whitten allegedly stated that "they received many phone calls in his office from the

residents of Weston Lakes who were deprived of being able to vote."  Whitten promised to speak

with Judge Hebert, but never called back.  (*Id.*, Ex. I).

### 6.     Inadequate Training by Fort Bend County

The plaintiffs allege that the improper refusal to provide provisional ballots, delays at the

polls, and misinformation from the County resulted from failures by the State of Texas and Fort

Bend County "to properly select, hire and train its poll officials to treat all voters[ ] competently,

fairly, and equally."  (Docket Entry No. 27 ¶ 9(I)).  The plaintiffs allege that the training and

instruction of election officials was "casual and informal," taking "only one hour to cover the

extensive and complex Election Code[ ] and its rules, regulations, practices and procedures."

### 7.     Inadequate Voter Registration Services by the State of Texas

The plaintiffs also allege that the voter registries generated by the State of Texas were

inaccurate or outdated and that the State failed to issue updated voter registration cards in a timely

fashion.  (Docket Entry No. 27 ¶¶ 48–51, 68).  Plaintiffs David and Shellie Broyles allege that after

they went to the polls with a driver's license showing their old address, they completed change of

registration cards but "have never received new voter registration cards."  David Broyles later

changed his driver's license online and changed his voter registration at the same time but never

20

received a new registration card.  (Docket Entry No. 1, Ex. I).  Plaintiff Eric Jones alleges that he changed his driver's license and updated his voter registration on the DPS website  in "the latter part of 2007" but did not receive a new voter registration card before the incorporation vote.  (*Id.*, Ex. I-1).  Plaintiff Brian Koons states that he requested an updated voter registration card when he applied for an updated driver's license after moving to Weston Lakes in March 2005 but never received a new voter registration card.  (*Id.*, Ex. M).

### E.     The Results of the Municipal Incorporation Special Election

There were 1,472 eligible voters for the incorporation issue.  Over two-thirds voted in the election.  The final vote tally was 569 for incorporation and 408 against.  The early voting result was 402 for incorporation and 163 against.  The election day voting result was 149 for incorporation and 163 against.   (Docket Entry No. 7, Ex. Q; No. 14, Ex. 3 at 4).  County Judge Hebert certified the results and ordered incorporation on May 20, 2008 over the filed objections of  David and Shellie Broyles, Ted and Patti Howden, Jo and Craig Gebbert, James and Suzanne McKean, Debra and Jerry Mosbacher, and Charles Sheffield.  (Docket Entry No. 14, Ex. 3-H, 3-I).  Minutes from the May 20, 2008 meeting of the Fort Bend County Commissioners state:

> Judge Herbert read a statement that a valid petition of registered voters within the proposed incorporated area was submitted to the County Judge's office.  By law the County Judge is required to order an election.  The election was held according to procedures outlined in the statute.  The election for incorporation passed by a 58% margin.  74.3% of eligible voters voted in that election.  Canvassing the votes and validating the tabulations of the returns as required under the statute is between 8 and 11 days following the election. Within 20 days after the County Judge receives the returns, if a majority of the votes cast are for incorporation, the Judge shall make entry in the records of the Commissioner Court that the community is incorporated.  This is purely administrative in nature.  If there are complaints to be made by any citizen as to the manor [sic] in which the election was held, that claim is properly made in the courts of the

> State of Texas and not before Commissioners Court. The authority here, under law, is merely to record the actions of the voters in a legally held election. Therefore this court has no choice but to enter into the records of the Commissioners Court the Order of Incorporation. If Commissioners Court receives a court order in the future in an election contest, from a Court of Jurisdiction, this Commissioners Court will certainly comply with that court order.

(*Id.*, Ex. 3-B ¶ 19).

## II.    The Plaintiffs' Allegations

On July 25, 2008, the plaintiffs filed suit in this court seeking a declaratory judgment that Texas Local Government Code § 7.006 was unconstitutional, "equitable relief" voiding or enjoining the results of the election, and injunctive relief and and money damages under 42 U.S.C. § 1983 against Texas, Fort Bend County, the WLPOA, the Incorporation Committee, the Citizens' PAC, the individual trustees of the WLPOA, and Aldrich. (Docket Entry No. 27 ¶ 6). The plaintiffs state that their challenge to the municipal incorporation election is premised on infirmities in the process rather than on any objection to the substantive result. The plaintiffs do not state whether or not they voted (or would have voted) for incorporation.

The plaintiffs' First Amended Complaint contains the following counts:

In the first count, the plaintiffs seek a declaratory judgment that Texas Local Government Code § 7.006, which permits only "qualified voter[s] who reside within the boundaries of the proposed municipality" to vote in municipal incorporation elections, violates the Equal Protection Clause in the Fourteenth Amendment, the Due Process Clause, the Privileges and Immunities Clause in Article IV, Section 2, and the Privileges or Immunities Clause in the Fourteenth Amendment because it does not permit non-resident land owners to vote. The plaintiffs contend that Texas lacks a "compelling interest" for "disenfranchising non-resident landlowners from voting on the one-

22

occasion, one-issue, special, specific, and dedicated incorporation referendum." The Plaintiffs Residing Outside Weston Lakes also seek class action treatment on this count.

In the second count, the plaintiffs allege that the State of Texas and Fort Bend County violated the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg *et seq.*, and the Help America Vote Act ("HAVA"), 42 U.S.C. § 15302 *et seq.* The plaintiffs complain that some Weston Lakes residents who had changed the address on their drivers' licenses before the municipal incorporation vote had not received new voter registration cards or were not reflected in the Weston Lakes voter registry, in violation of the NVRA, § 1973gg-3. The plaintiffs also allege that voters who told election officials that they were eligible to vote were not offered provisional ballots, as § 15482 of the HAVA requires. Texas has moved to dismiss the NVRA claim.

In the third count, the plaintiffs bring a § 1983 claim against Fort Bend County and its officers, asserting that "fatal errors" at the polls violated their civil rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Privileges and Immunities Clause in Article IV, section 2 and the Privileges or Immunities Clause in the Fourteenth Amendment. The plaintiffs also assert claims under the following federal civil rights statutes: 42 U.S.C. §§ 1971(a)(2)(A), (B), 1985(3), and 1986. The plaintiffs also allege that some of these "fatal errors" violated Texas election law. The alleged "fatal errors" are as follows:

•     Fort Bend County and County Judge Hebert violated Texas Local Government Code § 5.904 by referring to the "'Community' of Weston Lakes" in the Order for Special Election and on the official ballot. The plaintiffs argue that under § 5.904, "a [Type-B] municipality shall use the term . . . 'city,' 'town,' or 'village.'" (Docket Entry No. 27 ¶ 57). The plaintiffs argue that this makes the election voidable.

- The County violated § 7.005 of the Local Government Code because, although the statute required that notice of an incorporation election be "posted at three public places in the community for the 10 days preceding the date of the election," two of the three required notices were placed outside the Weston Lakes community and one was inside the Precinct 3 building in Fulshear, "which is usually locked and not open to the general public," and the other "inside the Fulshear-Simonton Library." The plaintiffs also cite a failure to provide "procedural due process" notice to the Bowser Road residents. (*Id.* ¶ 58).

- Fort Bend County poll officials failed to offer a provisional ballot to voters who could produce adequate proof of residence, in violation of the NVRA, the HAVA, and Texas Election Code § 63.001.

- Fort Bend County failed to prevent electioneering within 100 feet of the polls, in violation of Texas Election Code § 61.003.

- The appointment of Robert French and Alfred Vahlkamp as election judges for the municipal incorporation vote was improper because according to the plaintiffs, these were "political friends and supporters" of County officials, they both resided in Weston Lakes and favored incorporation, they were members of a pro-incorporation senior citizens' group, they were friends with Aldrich and other Incorporation Committee and Citizens' PAC members, and they took biased actions "with the objective of having Weston Lakes incorporated as a city irrespective of the voting rights of those residents who were opposed to incorporation." (*Id.* ¶ 59). The plaintiffs charge that Fort Bend County "inadequately selected, instructed, and trained its election officials," providing only one hour of "casual and informal" training on the "extensive and complex Election Code, and its rules, regulations, practices and

24

procedures," (*id.* ¶ 61), and failed to provide sufficient staff for the polls, (*id.* ¶ 66).   The plaintiffs allege that as a result of inadequate training and oversight, Vahlkamp was able to pursue "his illegal practice" of denying certain voters provisional ballots, (*id.* ¶ 64), and pro-incorporation voters were able to engage in electioneering within 100 feet of the polls, (*id.* ¶ 65).   The plaintiffs assert that poll officials refused to offer certain eligible voters provisional ballots while offering provisional ballots to others.  (*Id.* ¶ 62).

The fifth count also seeks relief under 42 U.S.C. § 1983.  It alleges a conspiracy by WLPOA, the Incorporation Committee, the Citizens' PAC, the individual WLPOA trustees, and Aldrich acting "under color of State law" to "take all actions and/or non-actions with the predetermined and prejudged objective of incorporating Weston Lakes as a municipal city."  The plaintiffs assert that "statements, disinformation, half-truths, misstatements, conduct, actions, and non-actions" violated 42 U.S.C. §§ 1985(3) and 1986.  (*Id.* ¶ 87–88).  The Incorporation Committee and Aldrich have moved to dismiss this count.

In the fourth count, the plaintiffs plead a state-law shareholders' derivative action on behalf of the WLPOA.   The plaintiffs allege that the WLPOA trustees "created and funded" the Incorporation Committee "with the predetermined and prejudged conclusion and objective that Weston Lakes should become a municipality" and engaged in improper pro-incorporation activity, including: raising and contributing funds; secretly gathering signatures for the application; providing Weston Lakes community names and addresses to the Citizens' PAC; pressuring residents to place "YES" signs on the front lawns; and electioneering within 100 feet of the polls.  (*Id.* ¶ 75).  The plaintiffs allege that the trustees' activities violated Texas Election Code § 253.132 because they caused the WLPOA to "make[ ] campaign contributions" and to "aid[ ] and assist[ ] in a political

25

campaign."   According to the plaintiffs, the trustees acted in their official capacities because "[t]rustees cannot separate and set aside their fiduciary duties when they are conducting Weston Lakes' affairs.  Whatever the [t]rustees do and say about the affairs in Weston Lakes is done or said as a [t]rustee. . . . [They are] clothed in the indicia of title and authority."  (*Id.* ¶ 78).

## II.    The Applicable Standards

### A.    Declaratory Judgment

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . .  may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  The Declaratory Judgment Act "is an enabling act, which confers discretion on the courts rather than an absolute right on a litigant."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)).  "The Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton*, 515 U.S. at 286.  "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."  *Id.* at 288.

Although the permissive "may" in § 2201(a) gives the district court broader discretion to decline to hear a declaratory judgment action than it has in other kinds of actions, the district court's discretion is not wholly unfettered.  *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 390 (5th Cir. 2001); *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994); *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 778 (5th Cir. 1993).  In deciding whether to retain or dismiss a federal declaratory judgment action, a district court "must determine: (1) whether the

26

declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 387 (5th Cir. 2003) (citing *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000)).

### B.      Injunctive Relief

An injunction is an extraordinary equitable remedy.  A preliminary injunction may be granted only if the plaintiff establishes four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.*; *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968)).  An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204 (citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex.App.–Dallas 1989, no writ)).

### C.      42 U.S.C. § 1983

42 U.S.C. § 1983 is the vehicle through which individuals may raise federal constitutional and statutory challenges to the conduct of a state or local election. *Kozuszek v. Brewer*, 546 F.3d 485, 489–90 (7th Cir. 2008).  Section 1983 provides a civil remedy for violations, under color of

state law, of a person's rights, privileges, or immunities arising under federal law.  *Bledsoe v. City of Horn Lake, Mississippi*, 449 F.3d 650, 653 (5th Cir. 2006).  A plaintiff can establish a prima facie case under § 1983 by alleging: 1) a violation of a federal constitutional or statutory right; and 2) that the violation was committed by an individual acting under the color of state law or municipal law. *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). The statute creates no substantive right, but only provides remedies for deprivations of rights created under federal law. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).  The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Holding a government official acting his official capacity liable under § 1983 requires a finding of state or municipal custom or policy.  *Lee v. Morial*, No. 01-30875, 2002 WL 971519, at *4 (5th Cir. Apr. 26, 2002); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "The official policy or custom must inflict the plaintiff's injury." *Lee*, 2002 WL 971519, at *4; *Monell*, 436 U.S. at 694.  "To show an unconstitutional policy or custom, the plaintiff must (1) identify the policy or custom, (2) connect the policy or custom with the government entity, and (3) show that the policy caused the plaintiff's particular injury." *Lee*, 2002 WL 971519, at *4; *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) (en banc).  Only prospective injunctive relief is available against states or state employees in their official capacities.  *Sossamon v. Lone Star State of Texas*, --- F.3d ---, 2009 WL 382260, at *11 n.74 (5th Cir. 2009).  Damages and injunctive relief are

available against municipalities and municipal officials in their official capacities.  *Fraire v. City of Arlington*, 957 F.2d 1269, 1277 (5th Cir. 1992).

A plaintiff states a § 1983 claim against a governmental official in his individual capacity by "alleg[ing] specific conduct giving rise to a constitutional violation."  *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002).   For a private citizen to be held liable under § 1983, the plaintiff must allege that the citizen conspired with or acted in concert with state or municipal actors.  *Priester v. Lowndes County*, 354 F.3d 414, 420 (5th Cir. 2004); *Mylett v. Jeane*, 879 F.2d 1272, 1275 (5th Cir. 1989).  Allegations of conspiracy "that are merely conclusory, without reference to specific facts, will not suffice."  *Priester*, 354 F.3d at 420.

### D.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."  FED. R. CIV. P. 12(b)(6).   In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  *Twombly* abrogated the Supreme Court's prior decision in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Twombly*, 127 S.Ct. at 1969 ( "Conley's 'no set of facts' language . . . is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . .").  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 1974; *see also*

*Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974).

A "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 127 S.Ct. at 1965). "'Rule 8(a)(2) . . . requires a showing, rather than a blanket assertion, of entitlement to relief.  Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests.'" *Dark v. Potter*, 293 F. App'x 254, 258 (5th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1965 n.3).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 127 S.Ct. at 1964–65); *see also In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1965).  "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 127 S.Ct. at 1966).  Although material allegations in the complaint must be accepted as true and construed in the light most favorable to the nonmoving party, a court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.  *See Elsensohn*, 530 F.3d at 371–72.

When considering a motion to dismiss under Rule 12(b)(6), "a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  The court may consider documents attached to the complaint without converting the motion to one for summary judgment.  *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004); *see also A2D Techs. Inc. v. MJ Sys., Inc.*, 269 F. App'x 537, 541 (5th Cir. 2008) ("[A]lthough we typically may not consider materials or documents outside of the complaint in addressing a motion to dismiss, we may consider documents attached to the complaint.").

"Even if a party does not make a formal motion under Rule 12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties."  5B CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE–CIVIL § 1357 (3d ed. 2004).  Such dismissal is appropriate if the plaintiff has notice of the possibility of a ruling on the merits or if the plaintiff has had the opportunity to allege its "best case."  *Lozano v. Ocwen Fed. Bank,* 489 F.3d 636, 642 (5th Cir. 2007); *Barzorowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998); *Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir. 1991); *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986).  Notice is adequate if the plaintiff is aware that the defendant has challenged the sufficiency of the claims in a context outside a formal motion under Rule 12(b)(6).  *See First Gibraltar Bank, FSB v. Smith*, 62 F.3d 133, 135 (5th Cir. 1995).

Rule 15(a) of the Federal Rules of Civil Procedure permits a plaintiff to amend his pleading "once as a matter of course" before a responsive pleading, if allowed, is filed. FED. R. CIV. P. 15(a)(1).  Thereafter, the Rule does not permit pretrial amendments without the written consent of

the opposing party or the court's leave.  FED. R. CIV. P. 15(a)(2).  The Rule provides that a "court should freely give leave when justice so requires," but approval is not automatic.  *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981).  The decision to grant or deny leave to amend is within the sound discretion of the trial court and "denial of leave to amend may be required when allowing an amendment would cause undue prejudice to the opposing party." *Underwriters at Interest on Cover Note JHB92M10582079 v. Neutrinos*, 79 F.3d 480, 484 (5th Cir. 1996).  A court is instructed to consider the following five factors in deciding whether to grant leave to amend a complaint: "(1) undue delay, (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment."  *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003)).

A plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'") (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999)); *see also Great Plains Trust Co.*, 313 F.3d at 329.

## III.   Analysis

### A.   The Constitutionality of the Residency Requirement in Texas Local Government Code § 7.006

#### 1.   Equal Protection

32

The plaintiffs seek a declaratory judgment that Texas Local Government Code § 7.006 is unconstitutional because it permits only "qualified voter[s] who reside within the boundaries of the proposed municipality" to vote on incorporation, to the exclusion of nonresidents who own property within the boundaries of the proposed municipality.[9] The plaintiffs seek to enjoin the election results based on this purported unconstitutionality.  The Plaintiffs Residing Outside Weston Lakes also seek class action treatment on this claim.  The plaintiffs assert that strict scrutiny applies to the exclusion of nonresident property owners, and that even under rational basis review, § 7.006 is unconstitutional.  Fort Bend County, the Incorporation Committee, and Aldrich have moved to dismiss, arguing that rational basis review applies, and that the cases show that a government unit may legitimately restrict the right to participate in its political processes to residents.

The case law makes it clear that "a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders" and that such a restriction does not violate the Equal Protection Clause.  *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60,

---

[9] Under Texas Election Code § 11.002, a  "qualified voter" means a person who:
    (1)    is 18 years of age of older
    (2)    is a United States citizen;
    (3)    has not been determined mentally incompetent by a final judgment of a court;
    (4)    has not been finally convicted of a felony or, if so convicted, has:
        (A)    fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or
        (B)    been pardoned or otherwise released from the resulting disability to vote;
    (5)    is a resident of this state; and
    (6)    is a registered voter.

68–69 (1978).   In *Holt*, the Supreme Court considered an equal protection claim brought against

a city by nonresidents who were not allowed to vote in the city's elections but were subject to some

of the city's regulations and fees.   Residents of Holt, a small, unincorporated community on the

outskirts of Tuscaloosa, challenged an Alabama statute that subjected residents within a three-mile

radius around the corporate limits of a city of over 6,000 people to the police jurisdiction and

sanitary regulations of the city, and to the city's power to license businesses, trades, and professions,

but did not permit the residents to participate in the political processes of the city by voting in its

elections.   Under the statute, businesses within the city's police jurisdiction paid only half the

licensing fees chargeable to similar businesses within the city limits.   *Id.* at 61–62.

The Court determined that only rational basis scrutiny was required because the statute did

not "den[y] the franchise to individuals who were physically resident within the geographic

boundaries of the governmental entity," a fundamental right that, when denied in the context of a

general election, triggers strict scrutiny.   The Court observed:

> From [our earlier] voting qualifications cases a common
> characteristic emerges: The challenged statute in each case denied the
> franchise to individuals who were physically resident within the
> geographic boundaries of the governmental entity concerned.   No
> decision of this Court has extended the "one man, one vote" principle
> to individuals residing beyond the geographic confines of the
> governmental entity concerned, be it the State or its political
> subdivisions.   On the contrary, our cases have uniformly recognized
> that a government unit may legitimately restrict the right to
> participate in its political processes to those who reside within its
> borders.

*Id.* at 68–69 (internal citations omitted).   The Court reasoned that the activities of every municipality

will affect nonresidents, and that restricting the franchise to residents was reasonable line-drawing:

> A city's decisions inescapably affect individuals living immediately
> outside its borders.   The granting of building permits for high rise

34

> apartments, industrial plants, and the like on the city's fringe unavoidably contributes to problems of traffic congestion, school districting, and law enforcement immediately outside the city. A rate change in the city's sales or ad valorem tax could well have a significant impact on retailers and property values in areas bordering the city. The condemnation of real property on the city's edge for construction of a municipal garbage dump or waste treatment plant would have obvious implications for neighboring nonresidents. Indeed, the indirect extraterritorial effects of many purely internal municipal actions could conceivably have a heavier impact on surrounding environs than the direct regulation contemplated by Alabama's police jurisdiction statutes. Yet no one would suggest that nonresidents likely to be affected by this sort of municipal action have a constitutional right to participate in the political processes bringing it about.

Id. at 69. *Holt* was consistent with earlier cases holding that states and municipalities "have the power to require that voters be bona fide residents of the relevant political subdivision." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972); *see also Evans v. Cornman*, 398 U.S. 419, 422 (1970); *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 625 (1969); *Carrington v. Rash*, 380 U.S. 89, 91 (1965).

The case law also makes it clear that "[a]n electoral process in which residents of the area to be annexed [or incorporated] are eligible to vote but nonresident property owners are prohibited from voting is constitutionally acceptable." 2 MCQUILLIN MUNICIPAL CORPORATIONS § 7.18 (3d ed. 1999); *see also Pure Water Comm. of W. Md., Inc. v. Mayor and City Council of Cumberland, Md.*, No. Civ. 01-2611, 2003 WL 22095654, at *4 (D. Md. Sept. 4, 2003) ("A municipal corporation has the power to limit participation in its elections based on residency, even when that municipality engages in actions that affect ineligible voters."); *Foothill-De Anza Community College Dist. v. Emerich*, 158 Cal. App. 4th 11, 27 (Cal. App. 2007) (restricting the vote on a community college bond measure to residents had a rational basis; there was a probability that "local residents had a

35

greater knowledge and interest in local affairs, while nonresident property owners would mainly be interested in lower taxes"); *Neilson v. City of California City*, 133 Cal. App. 4th 1296, 1317 (Cal. App. 2005) (restricting the vote on a flat-rate parcel tax measure to city residents, to the exclusion of nonresident property owners, had a rational basis because the "City could have determined that the residents are most knowledgeable and interested in all aspects of local affairs, on both the revenue and expenditure side of its ledger"); *Massad v. City of New London*, 652 A.2d 531, 539 (Conn. Supp. 1993) (restricting the vote on a city budget and tax rate ordinance to city residents, to the exclusion of nonresident property owners, was "tailored to legitimate governmental concerns and [wa]s not overridden by the interests of persons owning taxable property in the town who prefer to live elsewhere"); *Givorns v. City of Valley*, 598 So.2d 1338, 1340 (Ala. 1992) (finding a rational basis for restricting a municipal annexation election to residents of the area to be annexed, to the exclusion of nonresident property owners); *Ex parte Progreso Indep. Sch. Dist.*, 650 S.W.2d 158, 163 (Tex. App.–Corpus Christi 1983, writ denied) ("It is well settled that states may require voters to reside in the political subdivision which is holding the election."); Robert C. Ellickson, *Suburban Growth Controls: An Economic and Legal Analysis*, 86 YALE L. J. 385, 404 n.47 (1977) ("It is clear that nonresident landowners have no constitutional right to vote in local general elections.").

The plaintiffs have not cited a case holding that equal protection requires a municipality to extend the right to vote to nonresidents who own property within its borders. The plaintiffs correctly point out that in some cases, a municipality's decision to *permit* nonresident property owners to vote does not violate equal protection. In *May v. Town of Mountain Village*, 132 F.3d 576, 581 (10th Cir. 1997), for example, the court upheld, on rational basis review, a municipal statute that permitted both municipal residents and nonresident property owners to vote in the municipality's elections.

The residents argued that the inclusion of nonresident property owners diluted their fundamental rights as residents to vote in the election.  The court rejected the challenge (although it recognized that "[n]onresidents do not have a fundamental right to vote"), because the property owners, who paid taxes and would be subject to land-use restrictions developed by the municipality, "ha[d] a sufficient interest in Town affairs to make it rational for the Town to include them in the political process."  *Id.* at 582–83.  The plaintiffs also cite two Supreme Court cases, both involving quasi-private water districts that served only property owners, that upheld on rational-basis review voting schemes in which only the property owners were permitted to vote.  *See, e.g., Ball v. James*, 451 U.S. 355 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973).  Both of these cases, however, were premised on the fact that residents who did not own property had virtually no interest in the water rights at issue.  The plaintiffs do not suggest that residents of the City of Weston Lakes lack an interest in the workings of the municipality in which they reside.  More importantly, at issue in *Ball* and *Salyer* was not whether the property owners had a constitutional *right* to vote in the water district elections – the Court recognized that they did not – but rather whether the voting schemes could constitutionally *exclude* residents who did not own property.  Neither the *May*, *Ball*, or *Salyer* decisions, nor other case, stand for the proposition the plaintiffs urge: that equal protection *requires* that nonresident property owners be given the right to vote.

There are a number of rational bases for a municipal voting scheme that restricts the vote to its residents, even if nonresident property owners will be affected by some of the decisions made by the municipality.  Residents "have a greater individual interest in the development and welfare of the town than do nonresidents.  They have a greater personal knowledge of the city's conditions,

and, as inhabitants, they have a greater personal stake in the city's welfare and progress, including the growth of its schools and other institutions." *Massad*, 652 A.2d at 538.  Local residents usually have a "greater knowledge and interest in local affairs," while nonresident property owners may "mainly be interested in lower taxes." *Foothill-De Anza*, 158 Cal. App. 4th at 25; *Neilson*, 133 Cal. App. 4th at 1317.  It is rational, "in order to ensure that sufficient revenue will be raised by the town," to "exclude nonresidents who are likely to vote for a lower tax rate because they may not personally and directly benefit from expenditures for the welfare of the town." *Massad*, 652 A.2d at 538.  There is a rational basis for Section 7.006 of the Texas Local Government Code.  The statute does not violate equal protection.  The request by the group of plaintiffs residing outside Weston Lakes for class-action treatment is denied as moot.

### 2. Due Process and Privilege and Immunities

The plaintiffs' due process and privileges and immunities challenges to § 7.006 also fail.  Due process applies "when a person has a legitimate claim of entitlement to a benefit."  "[P]roperty interests . . . are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921, 930 (5th Cir. 1988) (concluding that because state law provided no mechanism for landowner to compel municipality to annex land, the plaintiff  landowner who sought to have his land annexed had no due process right to annexation).  The State of Texas has created a "property" right for residents within the boundaries of a proposed municipal corporation to vote in municipal incorporation elections.  Section 7.006 does not deprive residents of a proposed municipal corporation of the right to vote in a municipal incorporation election.  There is no due process violation.

38

The Court in *Hunt* addressed an argument similar to the plaintiffs' due process argument and rejected it. The Court held that the plaintiffs' "argument proceeds from the assumption, earlier shown to be erroneous . . . that they have a right to vote in Tuscaloosa elections. Their conclusion fails with their premise." 439 U.S. at 75.

The plaintiffs' challenge to § 7.006 under the Privileges and Immunities Clause of Article IV, Section 2 of the Constitution also fails. The clause states that "[t]he citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several states." This clause "merely limits the right of states to exclude citizens of other states from privileges granted to its own citizens." *Cramer v. Skinner*, 931 F.2d 1020, 1030 n.7 (5th Cir. 1991). Its "sole purpose" is to "declare to the several States, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within your jurisdiction." *Merrifield v. Lockyer*, 547 F.3d 978, 983 n.7 (9th Cir. 2008) (quoting *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 77 (1872)). Section 7.006 does not discriminate against voters on the basis of state citizenship. Instead, it permits only residents of the area of proposed incorporation, Texas citizens or not, to vote. Confronting a similar argument, the Sixth Circuit held that Tennessee did not violate the plaintiff's rights under the Privileges and Immunities Clause by requiring him to provide his social security number on his voter registration form "because everyone, whether a state citizen or not, was required to comply with the voter registration laws in order to vote in Tennessee." *McKay v. Thompson*, 226 F.3d 752, 756–57 (6th Cir. 2000).

The plaintiffs' challenge under the Privileges or Immunities Clause of the Fourteenth Amendment also fails. The clause states: "No state shall make or enforce any law which shall

abridge the privileges or immunities of citizens of the United States." The Supreme Court has stated that the protection extended under the clause "includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law." *Snowden v. Hughes*, 321 U.S. 1, 6–7 (1943). The right to vote for state officers or initiatives "is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause." *Id.* at 7. The right to vote in a municipal incorporation election is rooted in state law. The plaintiffs fail as a matter of law to state a claim under the Privileges or Immunities clause of the Fourteenth Amendment. *See Citizens' Right to Vote v. Morgan*, 916 F. Supp. 601, 608 (S.D. Miss. 1996).

Redress for the plaintiffs' grievance about the exclusion under § 7.006 of nonresident property owners from municipal incorporation elections lies not with the courts but with the legislature. At least ten states – Arizona, Colorado, Connecticut, Delaware, Indiana, Montana, New Mexico, North Dakota, Tennessee, and Wyoming – have passed statutes that give municipalities the option of allowing nonresident property owners to participate in municipal elections. Other states are considering similar measures.[10]

Section 7.006 of the Texas Local Government Code is constitutional. The plaintiffs' request for a declaratory judgment that § 7.006 is unconstitutional is denied. Section 7.006 does not provide a basis for voiding the May 10, 2008 incorporation election or voiding or enjoining the November

---

[10] *See* National Conference of State Legislatures, *Nonresident Property Owners and Voting in Local Elections: A Paradigm Shift?* The Canvass (Oct. 2008), *available at* http://www.ncsl.org/print/legismgt/elect /Canvass_Vo15A.pdf (describing state legislative trend toward permitting nonresident property owners to vote in municipal elections).

4, 2008 mayoral and alderman elections.  The § 1983 claims premised on the unconstitutionality of § 7.006 are dismissed.

### B.    Whether Texas and Fort Bend County Can be Liable Under the National Voter Registration Act for the Alleged Voter Registration Delays and Inaccuracies

The plaintiffs allege that Texas and Fort Bend County violated the NVRA, 42 U.S.C. § 1973gg *et seq*., by failing to issue updated voter registration cards, failing to update the municipal voter registry, and failing to permit those who had attempted to update their voter registrations before the election or those who updated their voter registrations in-person at the polls to vote on the municipal incorporation issue.  Texas and Fort Bend County move to dismiss on the ground that the NVRA applies only to elections for *federal* office and is therefore not available as a remedy to the plaintiffs in this municipal election dispute.  Texas and Fort Bend County also argue that the plaintiffs lack standing to pursue their claims because they did not first inform the Texas attorney general and provide the State an opportunity to cure the deficiencies, as is required under the Act.

Section 1973gg-3 of the NVRA provides, in relevant part, that "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration requirements."  42 U.S.C. § 1973gg-3(d).  Section 1973gg-6 provides that "[i]n the administration of voter registration for elections for Federal office, each State shall ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority" or "State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election." 42 U.S.C. § 1973gg-6(a). Section 1973gg-2 requires each state to establish procedures

41

for "elections for Federal office" in which voters may apply in person for a change of registration.

42 U.S.C. § 1973gg-2(a).

The NVRA also prescribes the method for enforcement:

> (a)     Attorney General
> The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this subchapter.
>
> (b)     Private right of action
> > (1)     A person who is aggrieved by a violation of this subchapter may provide written notice of the violation to the chief election official of the State involved
> >
> > (2)     If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.
> >
> > (3)     If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

42 U.S.C. § 1973gg-9(b).

The NVRA by its terms applies to voter registrations for "elections for *Federal* office." The Supreme Court has described the NVRA as "requir[ing] States to provide simplified systems for registering to vote in *federal* elections, i.e., elections for federal officials, such as the President, congressional Representatives, and United States Senators." *Young v. Fordice*, 520 U.S. 273, 275–76 (1997). The courts that have addressed the issue have concluded that the Act does not apply to state or municipal registration or ballot questions without a federal component.

42

In *Dubrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000), for example, the court determined that the plaintiff could not bring an NVRA challenge to Nebraska's rules governing the maintenance and updating of state voter registration rolls and the collection of signatures necessary to place an initiative on a state ballot.  The court observed that "[t]he provisions of the NVRA are expressly limited to federal elections," and "are directed to what states must do with respect to elections for federal office."  *Id.* at 1029–1030.  The court examined the legislative history and concluded that Congress intended to create a private right of action under the NVRA only in the context of a denial of access to voting for federal elective office, noting that the NVRA's stated purpose was "'to establish procedures that will increase the number of eligible citizens who register to vote in *elections for Federal office*.'"  *Id.* at 1029 (quoting 42 U.S.C. § 1973gg(b)).  The *Dubrovolny* court further observed that Congress enacted the NVRA under its authority to regulate federal elections, rather than under Spending Clause authority.  The authority to regulate federal elections "does not give Congress the power to directly regulate state voter registration procedures in state elections or state ballot issues."  *Id.* at 1028.  The court concluded that "a private right of action to enforce the voter registration list maintenance provisions of the NVRA is limited to challenges by voters harmed by violations of the NVRA in the context of elections for federal office."  *Id.* at 1030.

In *Association of Community Organizers for Reform Now v. Miller*, 129 F.3d 833, 837 (6th Cir. 1997), the Sixth Circuit upheld a lower court's rejection of a constitutional challenge to the NVRA.  The challenge was brought by plaintiffs who argued that the NVRA impermissibly encroached upon Michigan's state sovereignty by interfering with state election procedures.  The Sixth Circuit held that "[a]lthough the registration obligations imposed by the Act will likely affect

43

registration procedures associated with state and local elections, this result will arise as a matter of convenience and not because the Act requires it.  Nothing in the Act prohibits a state from adopting separate registration requirements" for state elections.  *Id.*  In *Espada v. New York Bd. of Elections*, 2007 WL 2588477, at *4 (S.D.N.Y. Sept. 4, 2007), the court concluded that a candidate for local office who was denied a space on the Democratic primary ballot because his change of registration to Republican had not yet been processed by New York state had no cause of action under the NVRA because he did not "allege that he ha[d] been subjected to discriminatory or otherwise unfair registration laws or procedures in the context of any federal election."  In *Pree v. Dist. of Columbia Bd. of Elections & Ethics*, 645 A.2d 603, 605 (D.C. 1994), the court concluded that the NVRA did not apply to Washington D.C.'s rules for nominating petitions and voter registration for city elections because the NVRA "by its terms applies only to elections 'for Federal office.'"

The May 10, 2008 election was a special-purpose election organized for the purpose of voting on the proposed incorporation of the City of Weston Lakes and two other municipal issues. It was not an election for federal office.  The plaintiffs have no cause of action under the NVRA. The plaintiffs have not alleged or presented any evidence of registration problems that affected their right to vote in a federal election or on any issue beyond the incorporation issue.  The NVRA does not apply.

Even if the NVRA otherwise applied to municipal registration issues, the plaintiffs have not satisfied the § 1973gg-9 prerequisite that a private party may sue only after the "chief election official of the State involved" is given notice of the violation and 90 days to cure (or 20 days "if the violation occurred within 120 days before the date of an election for Federal office").  42 U.S.C. § 1973gg-9(b)(1), (2).  The only exception to this requirement exists "[i]f the violation occurred within

30 days before the date of an election for Federal office." *Id.* § 1973gg-9(b)(3); *see Nat'l Coalition for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 286 n.2 (4th Cir. 1998) ("Before suing for declaratory or injunctive relief under the [NVRA], a person must (in most cases) give the state's chief election official prior written notice of the alleged violation."); *Ass'n of Community Orgs. for Reform Now*, 129 F.3d at 838 ("[L]anguage and legislative history of [the NVRA] indicate that Congress structured the notice requirement in such a way that notice would provide states in violation of the [NVRA] an opportunity to attempt compliance before facing litigation."). Although many of the violations the plaintiffs allege occurred within 30 days before the municipal incorporation vote, that vote was not "an election for Federal office," and the exception does not apply. The plaintiffs concede that they did not provide the Texas Secretary of State with notice until July 2008, after the municipal incorporation vote, and that the "notice" came in the form of a Summons and original Complaint notifying the State that it was named as a defendant in the present suit. The plaintiffs have not satisfied the requirements under § 1973gg-9 to pursue a private right of action.

The plaintiffs argue that notice under the statute is discretionary because § 1973gg-9(b)(1) provides that "[a] person who is aggrieved by a violation of this subchapter *may* provide notice of the violation to the chief election official of the State" (emphasis added). The plaintiffs' interpretation is incorrect. The subsequent subsection clarifies that notice is mandatory: "If the violation is not corrected within 90 days after receipt of a notice . . . the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." § 1973gg-9(b)(2). If notice was optional, the 90-day cure period would be superfluous. The following subsection provides that "[i]f the violation occurred within 30 days before the date

45

of an election for Federal office, the aggrieved person *need not* provide notice to the chief election official of the State." 42 U.S.C. § 1973gg-9(b)(3) (emphasis added).  That plaintiffs "need not" give notice before filing suit under these conditions confirms that the notice is otherwise required.  The plaintiffs' interpretation would make § 1973gg-9(b)(2) and (3) meaningless.

The plaintiffs are not entitled to a declaratory judgment that Texas and Fort Bend County violated the NVRA, and the municipal incorporation election cannot be voided or its results enjoined on this basis.  The motion to dismiss the NVRA claim is granted.

### C.     Whether Texas and Fort Bend County Can be Liable Under the Help America Vote Act for the Alleged Failure to Offer Provisional Ballots

The plaintiffs also argue that Texas and Fort Bend County violated HAVA by failing to make provisional ballots available to registered voters whose names did not appear on the voter registry, as required by 42 U.S.C. § 15482(a).  The plaintiffs allege that James Ritter, Eric Jones, James L. Fields, David Broyles, Shellie Broyles, Lisa Theut, and Scott Theut were entitled under the HAVA to provisional ballots but were not offered them.

Section 15482(a) states, in relevant part:

> If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot as follows:
>> (1)     An election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election.
>> (2)     The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is –

<div style="margin-left:3em;">

(A)     a registered voter in the jurisdiction in which the individual desires to vote; and

(B)     eligible to vote in that election.

</div>

42 U.S.C. § 15482(a).

Like the NVRA, § 15482 of the HAVA refers to "an election for Federal office," and prescribes a procedure through which an eligible voter "may cast a provisional ballot in *that* election." *Id.* (emphasis added). Section 15482 is part of a subchapter of the HAVA titled "Uniform and Nondiscriminatory Election Technology and Administration Requirements." The first section in that subchapter prescribes uniform standards for "voting system[s] used in . . . election[s] for Federal office." 42 U.S.C. § 15481. There is no basis to conclude that the provisions of § 15482 apply to voting that does not involve "elections for Federal office."

The Tenth Circuit confirmed this interpretation in *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1325 (10th Cir. 2008), rejecting the ACLU's argument that the HAVA preempted a municipal law governing the conduct of municipal elections in Albuquerque. The municipal law required different and more stringent methods of voter identification than did the HAVA, imposing burdens on voters that the HAVA likely would not permit. The Tenth Circuit noted that HAVA applied to "all elections that include election to federal offices" and noted that the municipal law "only applies to Albuquerque municipal elections." *Id.* The court concluded that because the HAVA does not reach municipal elections, the municipal law was not preempted despite the fact that it was not compatible with the HAVA. *Id.*

The plaintiffs allege that in the municipal incorporation election, Texas and Fort Bend County failed properly to instruct poll workers to make provisional ballots available, and that Fort Bend County poll officials improperly failed to offer provisional ballots to eligible voters. The

HAVA does not apply to this municipal election.  The plaintiffs are not entitled to relief on the ground that Texas and Fort Bend County violated the HAVA.  Those claims are dismissed.

### D.    Whether the Plaintiffs Have a Claim under 42 U.S.C. § 1983 Against Texas and Fort Bend County for Alleged Voting Irregularities

The plaintiffs allege that irregularities by the State of Texas, Fort Bend County, and their respective officials in the lead-up to the municipal incorporation election violated federal constitutional and statutory rights.  The plaintiffs complain that the Order of Special Election and election ballot improperly referred to Weston Lakes as a "Community" rather than a "City";  that the "political" appointments of Robert French and Alfred Vahlkamp as election judges were improper because French and Vahlkamp were biased toward incorporation; and that Fort Bend County spent insufficient time training poll workers about the election code.  The plaintiffs also complain that notice of the special election was constitutionally inadequate and violated state law because there was only one physical posting in Weston Lakes.

The plaintiffs also assert federal constitutional and statutory violations resulting from alleged irregularities in the conduct of the municipal incorporation election.  They allege that Vahlkamp failed to stop electioneering by "Vote YES" advocates within 100 feet of the polls, that voters experienced delays at the polls caused by understaffing and inadequate training of poll officials, that poll officials failed to offer provisional ballots to at least twelve different voters, and that provisional ballots were offered only when specifically requested by the voter or, in two instances, by a member of the "VOTE YES" group.  The plaintiffs suggest that in at least in the case of one voter, Lisa Theut, this refusal was intentional, as election judge Vahlkamp believed that this "young voter" would vote against the municipal incorporation issue.  They suggest that Jessie Oliver, an African-

American woman, was later provided the opportunity to vote by absentee ballot because Fort Bend

County feared a "racial component" if she complained.

### 1.      The Constitutional Claims

"When a litigant invokes § 1983 and challenges in federal court the conduct of a state or

local election, the federal court is faced with, among other policy concerns, the difficult task of

balancing the protection of the fundamental right to vote enshrined in the first and fourteenth

amendments with the avoidance of excessive entanglement of federal courts in state and local

election matters." *Dieckhoff v. Severson*, 915 F.2d 1145, 1148 (7th Cir. 1990).  To achieve this

important balance, circuit courts faced with claims that election irregularities violated due process

and equal protection rights "'have uniformly declined to endorse action under § 1983 with respect

to garden variety election irregularities.'" 3 JOSEPH G. COOK & JOHN L. SOBIESKI, JR., CIVIL RIGHTS

ACTIONS § 8.04[E] (2008) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978)).

Section 1983 is implicated only when there is "willful conduct" that "undermines the organic

processes by which candidates are elected." *Kozuszek v. Brewer*, 546 F.3d 485, 488 (7th Cir. 2008).

The standard is whether the alleged election irregularities "implicat[e] the very integrity of the

electoral process," "reach[ing] a point of patent and fundamental unfairness." *Welch v. McKenzie*,

765 F.2d 1311, 1314 (5th Cir. 1985) (internal citations and quotations omitted).  "Such a situation

must go well beyond the ordinary dispute over the counting and marking of ballots," *id.,* even if the

"garden variety" errors "control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d

1218, 1226 (9th Cir. 1998).  Examples of "garden variety" irregularities include malfunctioning

voting machines and the refusal to hold a manual recount, *Hennings v. Grafton*, 523 F.2d 861,

864-65 (7th Cir.1975); human error resulting in miscounted votes and a delay in the arrival of voting

machines, *Gold v. Feinberg*, 101 F.3d 796, 801–02; mishandling procedurally deficient absentee ballots to the detriment of a minority candidate, *Welch*, 765 F.2d at 1317; an allegedly inadequate State response to illegal cross-over voting, *Curry v. Baker*, 802 F.2d 1302, 1316 (11th Cir. 1986); mechanical and human error in counting votes, *Bodine v. Elkhart County Election Bd.*, 788 F.2d 1270, 1272 (7th Cir.1986); technical deficiencies in formatting and printing ballots, *Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983); mistakenly allowing nonparty members to vote in a congressional primary, *Powell*, 436 F.2d 84, 85–86 (2d Cir. 1970); counting some votes that were illegally cast, *Pettengill v. Putnam County R-1 School Dist.*, 472 F.2d 121, 122 (8th Cir. 1973); and arbitrarily rejecting certain ballots, *Johnson v. Hood*, 430 F.2d 610, 612–13 (5th Cir. 1970).  Examples of infringements of voting rights that have risen to the level of constitutional equal protection or due process violations include the dilution of votes by reason of malapportioned voting districts or weighted voting systems, *Reynolds v. Sims*, 377 U.S. 533 (1964) and the purposeful or systematic discrimination against voters of a certain class, *Carrington v. Rash*, 380 U.S. 89 (1965), or of a certain political affiliation, *Shakman v. Democratic Org. of Cook County*, 435 F.2d 267 (7th Cir. 1970).

In this case, the plaintiffs have alleged only "garden variety" election irregularities by Texas, Fort Bend County, and their respective officials.  There is no allegation that Fort Bend County or Judge Hebert intended to interfere with the plaintiffs' constitutional voting rights by referring to Weston Lakes as a "Community" rather than a "City" on the Order of Special Election and ballot. The plaintiffs do not allege that Fort Bend County intended to violate their voting rights by inadequately training poll workers or inadequately staffing the polls.  The allegation that Fort Bend County posted only one notice of the election in Weston Lakes is not accompanied by an allegation

50

that it was intended to result in a constitutional deprivation.  The uncontroverted evidence also shows that Fort Bend County placed notice in two other locations less than three miles from Weston Lakes, that Yates mailed each resident of Weston Lakes pro-incorporation materials, that Aldrich mailed residents of Bowser Road copies of the Order of Special Election, and that Bowser Residents saw a large "Vote NO on May 10th" billboard on FM 1093 near their homes.  *See Dieckhoff*, 915 F.2d at 1149 (concluding that even if the county's efforts at notice of school district referendum were not in technical compliance with the state notice statute, the efforts to comply and the "extensive local coverage of the referendum" meant that the technical violations did not raise a constitutional issue because they did not affect the "organic process" of the election).

The plaintiffs assert that the appointment of election judges French and Vahlkamp interfered with the fundamental fairness of the proceedings because these individuals were "political" appointments who favored incorporation.  But there is no authority to suggest that a constitutional issue arises simply because an individual with a preference as to the outcome participates in administering an election.  *See Kozuszek*, 546 F.3d 485, 489–90 (the suggestion that "a party member aggrieved by an election can successfully sue under section 1983 simply because a rival party administered the election . . . neither makes sense nor accords with the proper role of the federal courts"); *Ciempa v. Conforti*, 507 F.2d 3, 4 (1st Cir. 1974) (no constitutional issue arises because a candidate for office worked inside the polling place checking off absentee ballots).

The plaintiffs conclusorily assert that Vahlkamp knew of and failed to stop "Vote YES" electioneering that occurred outdoors within 100 feet of the polls during early voting.  They do not allege that this affected any voter's decision about whether and how to vote.  The plaintiffs also assert that Vahlkamp and other poll officials failed to offer provisional ballots to some eligible

voters.  But except in the case of Lisa Theut, whom the plaintiffs suggest was denied a provisional ballot because she was a "young voter" more likely to vote against incorporation, the plaintiffs do not allege that this was based on any information as to that voter's position on the issue or intended to affect the election outcome.  With the exception of Cheryl Stalinsky, the plaintiffs have not stated whether or not they voted for incorporation.  Even their attorney does not know how they voted. (Docket Entry No. 17 at 3).

The plaintiffs point out that poll officials gave a provisional ballot to Jeanell Ritter only after a person from the "Vote YES" camp took her back into the polls and told the poll official to giver Ritter a provisional ballot, and suggest that this is evidence that poll officials only offered provisional ballots to those who favored incorporation.  But plaintiffs Stacey Jones and Brian Koons requested and were given provisional ballots without any assistance from a member of the "Vote YES" group and do not allege that they revealed their voting preferences to the poll officials.

To the extent that the plaintiffs have pleaded any evidence of bias or irregularities by Texas, Fort Bend County, and their respective officials, these allegations do not support a constitutional claim under § 1983.  The standard is whether the alleged conduct so undermined the integrity of the electoral process that it rendered the election fundamentally unfair.  *Welch*, 765 F.2d at 1317.  The allegations in this case fall far short of the standard.

*Welch* is instructive.  The plaintiff in that case was an African-American candidate for district supervisor who ran against a white opponent.  The plaintiff lost the election by a narrow margin and would have won if 115 absentee ballots (an abnormally high number for the district) not been counted.  Only 4 of the absentee ballots were for the plaintiff; the remaining 111 were counted for the other candidate.  There was significant evidence of irregularities in the distribution, casting,

52

and counting of the ballots.  A court had previously found that at least one of the registrars had shown racial prejudice in dealing with African-American voters.  The Fifth Circuit nevertheless upheld the district court's dismissal of the plaintiff's § 1983 due process and equal protection claims because the abuses alleged were not "gross" or systemic and the appropriate remedy was under state election law.  *Id.* at 1314, 1316–17.  The Fifth Circuit found particularly persuasive the fact that state election law was capable of providing (and ultimately did grant) the relief the plaintiff sought: the removal of his opponent from office and a new election, as well as a finding that the opponent had participated in a conspiracy to commit voting fraud.  *Id.* at 1314.

Texas election law provided a remedy for the election problems the plaintiffs allege.  The results of elections on measures such as the municipal incorporation issue may be challenged under Texas Election Code chapter 233.  That chapter provides that "[o]ne or more qualified voters of the territory covered by an election on a measure may contest the election."  TEX. ELECTION CODE  § 233.002.  A court may "suspend implementation of the contested measure pending outcome of the contest," *id.* § 233.010, and has the power to declare the election void and order a new election, *id.* §§ 233.011, 233.012.  Grounds for an election contest include that "an election officer or other person officially involved in the administration of the election:  (A) prevented eligible voters from voting; (B) failed to count legal votes; or (C) engaged in other fraud or illegal conduct or made a mistake."  *Id.* § 221.003.  The plaintiffs in this case did not invoke the state corrective process.

"Elections are, regrettably, not always free from error.  Voting machines malfunction, registrars fail to follow instructions, absentee ballots are improperly administered, poll workers become over-zealous, and defeated candidates are, perhaps understandably, inclined to view these multifarious opportunities for human error in a less than charitable light."  *Hutchinson v. Miller*, 797

F.2d 1279, 1286–87 (4th Cir. 1986).  The alleged election irregularities committed by the State of Texas, Fort Bend County, and their respective officers do not give rise to a constitutional claim under § 1983.  The plaintiffs are as a matter of law not entitled to the declaratory, equitable, or damages relief they seek on the grounds that the State of Texas, Fort Bend County, and their respective officers committed irregularities in the election that violated § 1983.  The plaintiffs' motion to enjoin the election results and collect damages from Fort Bend County and from Texas and Fort Bend officers in their individual capacities based on federal constitutional violations in the conduct of the election is denied.

<div align="center">

**2.      The Plaintiffs' Federal Statutory Claims**

*a.      42 U.S.C. § 1971(a)(2)(A), (B)*

</div>

The plaintiffs also allege that the State of Texas and Fort Bend County, through their officers, violated § 1983 and 42 U.S.C. §§ 1971(a)(2)(A) and (B).  Section 1971(a)(2) provides:

> (a) Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests; agreements between Attorney General and State or local authorities;  . . . .
>
> (2) No person acting under color of law shall–
>
>> (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote;
>>
>> (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission

<div align="center">54</div>

> is not material in determining whether such individual
> is qualified under State law to vote in such election .
> . . .

42 U.S.C. § 1971(a)(2).  The statute also provides that "[w]henever any person has engaged . . . in

any act or practice which would deprive any other person of any right or privilege secured by

subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in

the name of the United States, a civil action or other proper proceeding for preventive relief,

including an application for a permanent or temporary injunction, restraining order, or other

order. . . ."  42 U.S.C. § 1971(c).

"[W]ell-settled law establishes that § 1971 was enacted pursuant to the Fifteenth Amendment

for the purpose of eliminating racial discrimination in voting requirements."  *Indiana Democratic

Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006).  The Fifth Circuit has held that only

racially motivated deprivations of rights are actionable under 42 U.S.C. § 1971.  *Kirksey v. City of

Jackson, Mississippi*, 663 F.2d 659, 664–65 (5th Cir. 1981).  The Fifth Circuit reasoned that § 1971

is "coterminous with the Fifteenth Amendment," and its legislative history "makes clear that it was

intended to have an effect no different from that of the fifteenth amendment itself."  *Id.*  (quoting

*City of Mobile v. Bolden*, 446 U.S. 55, 60–61 (1980)).  The plaintiffs do not allege that the actions

by poll officials were racially motivated.  The plaintiffs' claim based on § 1971 fails as a matter of

law.[11]

---

[11]  There is also authority in this circuit that, in light of the language in § 1971(c), § 1971 cannot be
enforced as a private right of action, even under § 1983. "This section is intended to prevent racial
discrimination at the polls and is enforceable only by the Attorney General, not impliedly, by private
persons." *McKay v. Altobello*, No. 96-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996) (citing *Good
v. Roy*, 459 F. Supp. 403 (D. Kan. 1978)). Numerous cases outside this circuit have affirmed the proposition.
*See McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section 1971 is enforceable by the Attorney
General, not by private citizens."); *Gilmore v. Amityville Union Free School Dist.*, 305 F. Supp. 2d 271, 279
(E.D.N.Y. 2004) ("[The] provisions [of § 1971] are only enforceable by the United States of America in an

b.      *42 U.S.C. § 1985(3)*

The plaintiffs allege that the alleged irregularities in the election were part of a conspiracy on the part of the State of Texas, Fort Bend County, and their respective officials to violate the plaintiffs' civil rights, in violation of 42 U.S.C. § 1985(3).  Section 1985(3) prohibits persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . ."  42 U.S.C. § 1985(3).

To state a cause of action under 42 U.S.C. § 1985(3) in the Fifth Circuit, a plaintiff must allege:

> (1) the defendants conspired (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and (3) one more of the conspirators committed some act in furtherance of the conspiracy; whereby (4) another person is injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by a racial animus.

*Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 n.12 (5th Cir. 2001) (quoting *Wong v. Stripling*, 881 F.3d 200, 202–03 (5th Cir. 1989)).  If the necessary element of race-based invidious discrimination is not present, the § 1985(3) claim fails and  the court need not reach the other

_____

action brought by the Attorney General and may not be enforced by private citizens."); *Spivey v. State*, 999 F. Supp. 987, 996 (N.D. Ohio 1998*); Willing v. Lake Orion Community Schs. Bd. of Trustees*, 924 F. Supp. 815, 819 (E.D. Mich. 1996).  The Eleventh Circuit, however, has ruled to the contrary.  *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (holding that § 1971 can be enforced by a private right of action under § 1983).  Because the plaintiffs' claim fails on other grounds, this court need not decide this issue.

elements. *Id.* at 271; *see also Johnson ex rel. Wilson v. Dowd*, 2008 WL 5212795, at *3 (5th Cir. Dec. 15, 2008) ("In this circuit, we require an allegation of a race-based conspiracy to present a claim under § 1985(3)."); *Bryan v. City of Madison, Miss.*, 213 F.3d 267, 276 (5th Cir. 2000); *World of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996). The plaintiffs do not allege that allegedly biased actions by poll officials were racially motivated. The plaintiffs' § 1983 claim premised on violations of § 1985 fails; the plaintiffs are not entitled to declaratory judgment, injunction, or damages relief on this ground.

> c.      *42 U.S.C. § 1986*

A claim under 42 U.S.C. § 1986, which permits an action for damages against any person having knowledge of "wrongs conspired to be done" under 42 U.S.C. § 1985 who has the power to prevent those wrongs, lies only if there is a viable conspiracy claim under 42 U.S.C. § 1985. *Bryan*, 213 F.3d at 276; *Newberry v. East Texas State Univ.*, 161 F.3d 276, 281 n.3 (5th Cir. 1998). The plaintiffs' § 1986 claim fails as a matter of law.

**E.      Whether the Plaintiffs Have Stated a Cause of Action under 42 U.S.C. §§ 1983 and 1985 Against the WLPOA, the Incorporation Committee, the Citizens' PAC, the Individual WLPOA trustees, and Aldrich for Conspiracy**

The plaintiffs also raise a § 1983 claim against the WLPOA, the Incorporation Committee, the Citizens' PAC, the individual WLPOA trustees, and Aldrich, alleging that these parties conspired to "speak and take all actions . . . with the predetermined and prejudged objective of incorporating Weston Lakes as a municipal city," in violation of 42 U.S.C. §§ 1985(3) and 1986. The plaintiffs allege that the Incorporation Committee was founded by the WLPOA with the predetermined conclusion that it would recommend incorporation and that the WLPOA supported neighborhood pro-incorporation efforts by supplying names and addresses while denying this same

information to anti-incorporation efforts.  The plaintiffs allege that Aldrich formed the Citizens'

PAC to advocate incorporation and then "covertly and stealthily" prepared a petition for

incorporation and engaged with the WLPOA trustees and Citizens' PAC members in a "clandestine"

campaign to get other residents to sign, sometimes not telling signers that their signature to the

petition meant that they desired that the Weston Lakes community be incorporated as a city.  The

plaintiffs allege that after the petition was granted and the election scheduled, Aldrich provided

misinformation to Weston Lakes residents about the putative tax benefits of incorporation.  The

WLPOA trustees and Aldrich allegedly placed "Vote Yes" signs on their lawns and urged their

neighbors to do the same.  They allegedly engaged in aggressive electioneering during early voting.

The plaintiffs do not allege that the conspiracy was racially motivated.  Under clear Fifth

Circuit law, the §§ 1985(3) and 1986 claims fail.  *See Johnson*, 2008 WL 5212795, at *3 ("In this

circuit, we require an allegation of a race-based conspiracy to present a claim under § 1985(3).");

*Horaist*, 255 F.3d at 271; *Bryan*, 213 F.3d at 276; *Newberry*, 161 F.3d at 281 n.3.  The plaintiffs'

§§ 1985(3) and 1986 claims fail as a matter of law.[12]

### F.    The State-Law Causes of Action

The plaintiffs have also raised state-law claims under Texas Local Government Code § 7.005

(notice for the incorporation election); Texas Local Government Code § 5.904 (Weston Lakes was

---

[12]  It is also not clear that any of the parties allegedly involved in this conspiracy could be considered to have been acting under color of state law, as § 1983 requires.  *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).  The WLPOA is a nonprofit corporation that controls the common areas, easements, and roads in the Weston Lakes, operating according to articles of incorporation, bylaws, and 40 pages of Covenants, Conditions and Restrictions ("CCRs").  (Docket Entry No. 27 ¶¶ 12, 13, 14).  The case law does not make clear whether an entity such as the WLPOA is a sufficiently state-like actor that its actions, and those of its trustees and affiliates, can be said to be sufficiently "under color of state law" for purposes of § 1983.  *See Rowley v. Tchefuncta Club Estates, Inc.*, 151 F. App'x. 349, 350 (5th Cir. 2005) (declining to rule on whether a private entity that maintained public areas, provided some utility services, and hired deputy sheriffs for a housing community functioned as a "state actor").

referred to as a "Community" rather than a "City"); Texas Election Code § 63.001 (eligible plaintiffs were denied provisional ballots); and Texas Election Code § 61.003 (electioneering within 100 feet of the polls).  The plaintiffs have also raised a state-law derivative action against the trustees of the WLPOA.

"The law within the Fifth Circuit Court of Appeals 'is and has been for almost three decades that claims premised on alleged violations of state election laws should be resolved in state courts.'" *Curtis v. Smith*, 145 F. Supp. 2d 814, 818 (E.D. Tex. 2001) (quoting *Casarez v. Val Verde County*, 16 F. Supp. 2d 727, 731 (5th Cir. 1998); *citing Hubbard v. Ammerman*, 465 F.2d 1169, 1176 (5th Cir. 1972), *cert. denied*, 410 U.S. 910 (1973)).  "Federal Courts do not intervene in state election contests for the purpose of deciding issues of state law, if no federal constitutional question is involved." *Hubbard*, 465 F.2d at 1181.

This court has found that the plaintiffs have no viable federal constitutional or statutory claims.  To the extent that the defendants have formally moved under Rule 12(b)(6) to dismiss certain federal claims, the motions are granted and those claims are dismissed with prejudice.  The remaining federal claims are also dismissed.  In their motion for injunctive relief and briefs in support, the plaintiffs put at issue the merits of each of their federal claims.  (Docket Entry Nos. 3, 6, 17).  Fort Bend County and the Incorporation Committee opposed the motion in full.  The plaintiffs filed a reply in support, and later filed an amended complaint to further address deficiencies identified in the response.  The plaintiffs have had the opportunity to present their "best case" on the federal constitutional and statutory claims. *Guthrie v. Tifco*, 941 F.2d at 379; *Jacquez*, 801 F.2d at 792.  The plaintiffs' allegations fail to state a claim for relief.  The federal constitutional and statutory claims fail as a matter of law.  Leave to amend again is not granted because the

plaintiffs have already amended and further amendment would be futile.  The federal claims are dismissed with prejudice and the state courts are the appropriate forum to resolve the state law claims.

## V.    Conclusion

This court denies the plaintiffs' federal claims with prejudice and grants the motions to dismiss filed by the State of Texas, the Incorporation Committee, and Aldrich.  The state-law claims are dismissed without prejudice to their assertion in state court.  No later than **April 15, 2009**, the parties are to identify any remaining issues that this court must address or file a proposed order of dismissal.

SIGNED on March 31, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge